Our next case for argument is Montoya v. Jeffreys, Appeal No. 22-2791. Hold on for one second. Okay, you can begin whenever you're ready. Good morning. May it please the Court? The United States Supreme Court has recognized the rights of parents to the custody and upbringing of their children as one of the longest-standing fundamental rights. That right is entitled to respect and absent a powerful countervailing interest protection. Under Illinois law, a condition of mandatory supervised release for any individual who has been convicted of a sexual offense is that they refrain from all contact with minors without the prior approval of an agent of the Department of Corrections. When that amount of discretion is given to the Department of Corrections, it is incumbent upon them to implement procedures and policies that ensure that right is not deprived for arbitrary reasons. So, Ms. Nicholas, can I just get one maybe big point out of the way? You did not discuss in your brief the Fels decision, Fels v. Fiedler, about the standard. But I read that to be actually quite clear that in this circuit, the Turner v. Safley standard applies to our evaluation of the measures that the state has chosen to take here. Would you agree with that? You're correct that in Fels, this court applied the Turner v. Safley standard to the evaluation of a parole condition that affected the constitutional rights of the individual on parole. I think what is missing from the state's analysis here is that Turner is receptive to the context in which it's being applied, meaning that both the rights of the individual and the interests of the government are different in different settings. So, for example, a restriction that may be perfectly appropriate and permissible in the prison context may not be appropriate and permissible when someone is on supervised release. But why does that help you? I mean, to take exactly that situation, the state emphasizes with respect to telephone calls, which seem less risky than, say, in-person visits. But they say in the prison, we're already all set up for telephone calls. We have monitoring capabilities. If somebody starts to become psychologically abusive, we can cut things right off there before the child is injured. And it's just not like that out on the outside once a person is on mandatory supervised release. So doesn't that sound pretty rational under the Turner standard? So I think that under Morrissey, a parolee's constitutional rights share many of the same core values as the rights of a free person. And that includes the right to the enduring attachments of normal life, such as to one's family. So there has to be a higher standard for respecting that right when somebody is out in the community. Otherwise, the purposes of mandatory supervised release will simply be undermined. So I think this court in Brown v. Phillips recognized that Turner is receptive to the context in which it's being applied. Do you have to invoke the idea of a higher standard to even make that argument? Isn't it just that Turner does make room? It recognizes context. And one context that's important here is that on parole, the goals of parole, there are goals of parole that aren't the same as the goals of a penitentiary or a prison environment. And one or two of the goals are rehabilitation and reintegration in the community. So then when we get to the issue of phone calls, for example, when doing this Turner analysis, you need to pay attention to that context and those differing goals and how that affects those goals that are different from a prison. That's exactly right. Why is it necessary to invoke this idea of a different or higher standard? You may be absolutely right that it's not necessary. Why is that a question for the courts? Why is that not a question for policymakers? I mean, if the test is a rational basis and we disagree with the rational basis, why is that our job to tell the other branches of government you stated a rational basis, we all agree it's rational, but we just disagree with your policy decisions and therefore we find a constitutional violation. So Turner just doesn't look solely at whether there's some plausible rationale for the restriction? Well, that's what it says. So you're saying we shouldn't take it at its word, okay? We shouldn't read the language. We should look deeper and evaluate and exercise our judgment on the value of the policy. So Turner contains four factors for the court to consider, and that last one is whether there's readily available alternatives to the restriction that suggests it's an exaggerated response. Okay, so what you're asking there is for us to say we, as judges, think it would be better for the parole board to be making these decisions, and therefore it's a constitutional violation for them not to. That is pretty dramatic, I think. So I think I wanted to separate the substantive claims from the procedural claims because I think it's quite clear that the procedural claims are not subject to the Turner analysis. Correct. They fall under Matthew's view. They're Matthew's again. Exactly. And so when you get to the procedural claims, you have to look at Matthew's factors rather than whether there's some rationale articulated for the restriction. And I know I have very limited time today, so I'm hoping that I can focus on those procedural claims, particularly who is rendering the decision here. And I think there's three reasons why therapists, who are the principal decision makers under the department's current policy, simply are not the appropriate people to be making the decision about whether a parent can maintain his or her ties with their child while on supervised release. First, they may have good intentions and some expertise in treating these folks, but they have interests and motivations that raise concerns about bias. And it should come as no surprise that they are treating parent-child contact as a privilege to be earned rather than a right to be respected in the absence of evidence that there is a specific and articulable risk to this parent's child. As Dr. Blaine testified at some length, he wants people to have motivation to make progress, motivation to respect all of the rules, things as minor as their curfew. And so he's withholding his approval for parent-child contact to give them motivation to reach those goals. But didn't Judge Feinerman say as a finding of fact that that's just an aberrant misunderstanding of the policy? I mean, I get where you're going with this, but didn't Judge Feinerman deal with that as a factual matter and disregard it essentially? And I think that was really an error because this is a feature, not a bug. This is exactly what happens when you give... So what about the appellate process? Because whatever you deal with, whoever is the decider here is not going to ignore the therapist, right? So the therapist is going to be the primary witness. You could have a district judge be the decider, and the therapist is going to testify and say, this is what I think. And the judge is going to say, well, I've got the testimony of a therapist. I'm neutral. I make a decision in large part based upon the therapist's testimony. Don't you have that here with the appeal process? A couple of responses to that. One is that if we have a neutral decision maker, that won't be their sole source of information, right? No one is disrespecting the expertise and skill of these therapists. They can and should weigh in. But the neutral decision maker should also hear from the parent, the child, the custodial parent, the person who has custody of the child, other therapists that might also have seen this person. Right now, none of that is taken into account because it's just the treater is making the decision. And I think there's an analogy here, which is that no one is saying that the therapist doesn't have skill and expertise. No one is saying their input isn't valuable. But the analogy is to the context of policing and arrests and searches. So can I just interrupt? I just want to make sure I know which half of the case we're on right now. Are we talking about the substantive reasonableness of what's going on, or are we talking about whether the Matthews against Eldridge process should be before different bodies or with different decision makers or kind of the more classically procedural? I'm focusing on the procedural issue right now. All right. So we're talking about procedure. Judge Finerman was saying this team of people that the state says are the ones responsible is a real thing. It's not just a window dressing to cover up the fact that the therapist is a dominant voice or the dominant voice, perhaps. And what worries me about your position is just going through the factors. One of the factors is the value that additional procedures could give. But the other is, of course, just the risk of an erroneous decision. And here I have trouble separating the state's strong interest in protecting children alongside of the strong interest of the parent. This isn't a one-sided, only one party has a strong interest. There are important things on both sides of the equation. And that's precisely why someone detached from the supervision and treatment of the individual should be the person rendering the decision. So, for example, we all want crimes ferreted out and solved. It's no disrespect to the skill of police officers that we require a warrant for searches of homes. And we have a judge weigh in on that. Or we require a neutral magistrate to weigh in on probable cause to detain. So I think that to properly balance those interests, which are both strong, you have to have somebody detached, neutral, unbiased, making that decision in the first instance. So one other point I wanted to come back to, Judge Kirsch, on your question about the appeals process. I think it is cool comfort for someone who is going to be subjected to this grievous deprivation of their constitutionally protected rights that they can later appeal that decision to someone else. And even if this court thinks that someone like the manager who is overseeing the SOMB is theoretically neutral enough, you're entitled to a neutral decision maker in the first instance, particularly whereas here the right at stake is so important and so vital to the people who are being subject to this deprivation. I think in the United States Supreme Court Ward versus City of Monroeville, the court rejected the idea that you could cure the lack of a neutral decision maker in the first instance by later being able to appeal to somebody who might be neutral. Let me understand your position on the Parole Review Board. As I understand your argument, you think the Parole Review Board or Prisoner Review Board should be the proper entity. And your position is we're not throwing the therapist out. The therapist is a major witness, but also the board could hear from other folks. Are you envisioning this happening on a post-release basis or a pre-release basis? People need to know what their terms of parole are going to be before they're released. And that is for very practical reasons, such as where can you live when you are released? We have clients, some of whom are discussed in our brief, who stayed in prison because they couldn't go home to their own family. Let me ask you this, so I hear your answer to be pre. What would be the error in taking that same scenario you envision and doing that on a post-release basis, but with the deadlines that you all say is so important? It's certainly better than what we have. It is certainly a more fair process to have a deadline in place, a neutral decision maker, and a prompt post-deprivation process. I think that it does raise some real problems for people who cannot plan their lives before they are released from prison onto supervised release. But what do you do with all of the findings that the district court made about the unsatisfactory nature of the information that's available at the pre-release stage and the information that only after release, maybe for some, it doesn't have to be forever, you know, 30 days, I don't know. For some period of time, though, post-release, see how this person is adapting to obviously a very different environment. So a couple of thoughts on that. I mean, he certainly says that. He goes on for pages about that point. One, under Carrie v. FIFAS, the right to procedural due process is absolute. So it does not depend on someone's success on the claim that they're entitled to release. But right now what is happening is the pre-release evaluation that is done is not even being taken into account. Any other therapy the person has gone through is not being taken into account. The input of the custodial parent or the child is not being taken into account. All that is happening is a presumptive ban is being imposed, and that is problematic. So I see I'm well into my rebuttal time, so if I can reserve the remainder. Thank you. Okay. Thank you, Ms. Tekelos. Ms. Schoenevert. Good morning, and may it please the court. I am Assistant Attorney General Kaitlyn Schoenevert, and I represent the defendant appellee. The district court properly concluded that the department's policy governing requests made by convicted sex offenders on parole to have contact with their minor children was largely constitutional, and the district court's factual findings supporting that conclusion were not clearly erroneous. So let me ask you about one part of this that bothers me. I take it that we're all comfortable on the substantive level that we're talking about Turner against Safley. I take it that we're all comfortable on the procedural level that we're talking about Matthews against Eldridge. But when the district court got down to applying these standards to the particular restrictions, the only thing he singles out really is written communications, and I thought that given the importance of the parental relationship, he slid too quickly over stories of the difficulty, let's say, of monitoring phone calls. I don't see why, for example, you couldn't say if you're going to have a phone call, you have to come to the probation office. If you're going to have a phone call, you have to let me place the call, and it's going to be a three-way call. These are not complicated things to arrange. It's not that the prison has all this capability that's not out there, and I felt that it really underestimated the critical nature of that parent-child relationship, even giving you the fact, which I do, that it's a very important interest on the side of the child's safety. It's a very important interest on the side of the parent. It's something that needs to be balanced. We're not here, as Judge Kerr says, to micromanage that balance, but to cut people off for such lengths of time is a very drastic step when there's nothing in the system to push it forward. So, Your Honor, to respond to your point as far as having individuals come into a parole office, I believe you were discussing- Yeah, make the phone call there. For phone calls. Yeah. So a couple of points. Have their cell phones disabled, you know, monitor the cell phones, whatever you need to do. Well, so I would note that that likely would create some kind of an administrative burden for the department just as far as ensuring that the facilities were available to the extent that they didn't need to be used by other- So you make appointments. I mean, you know, there's a probation office across the street from this building for the federal probation officers, and it's open rooms. They make appointments, you know, when people can come. You know, it doesn't mean you necessarily have the right to a phone call every afternoon, but maybe every other week is a lot better than zero for a year. Well, additionally, though, Your Honor, I don't believe that the plaintiffs actually ever proposed that as an alternative way for at least for phone contact. Well, there was just this blanket statement by the court that trying to replicate what was going on in the prisons would just be too burdensome, more than a de minimis burden actually is what he says, and I'm not sure that's even the right standard. Well, again, certainly the plaintiffs here have not specifically identified even that. As I recall, the plaintiffs did not in the district court argue that that would be a reasonable, feasible alternative that would not place significant administrative or fiscal burdens on the department, so that's- I'm not sure they ever reached the point where they had the burden to do that, though, because what the state was just saying was our system is permissible, end of discussion. We don't need to talk to you about any features that would better respect the parental rights of the people who are on mandatory supervised release. Well, certainly, though, again, the district court made significant factual findings, as Your Honor mentioned, about the importance of being sure that there's a way before even allowing contact to ensure that the department has time to gather some evidence about post-release evidence. The district court credited the testimony that pre-release evaluations cannot be used because there isn't that post-release evidence. But the court also, in the face of that, does single out the written communication, so what I'm worried about is that the court seems to have assigned a value of close to zero to the parental rights and a value of close to infinity to the rights of the state, and I'm not convinced under the correct Supreme Court decisions that discuss parental rights, it's a somewhat different line from either Turner or Matthew, whether that's correct, whether the parental interest is approximating zero. Well, Your Honor, again, the district court did acknowledge that there are significant parental rights at stake here, but again, even with communications via telephone, there would still need to be, I believe the district court correctly determined that there would still need to be some kind of post-release evidence that the department could take into consideration to determine whether or not those types of communications may even be appropriate. Why does telephone become dangerous the day you walk out of prison if you've been having telephone contact with your child through the period of your incarceration? There was testimony during the trial that when there are communications in the prison setting, those are closely monitored, it's a controlled setting, so there's ability to... So you have a database. You know that so-and-so has never abused his phone privileges in the prison because it was closely monitored and was under that general regime. Correct, but there was also testimony that once an individual is released from prison to serve their parole term, there are a lot of variables that can come into play. That's why I said maybe you can bring them in. I don't know why it's so black and white. Well, there was also testimony, and I did not see any nod to this by the district court, that therapists themselves, whose testimony the district court credited on all manner of other subjects, therapists also said they didn't see phone as particularly high risk for these clients. Certainly not as far as physical harm, but there was testimony that there could still be psychological harm that may happen during phone conversations, and in fact Dr. Blaine himself testified that he also believed that phone conversations were riskier outside of the prison context, and so there is still a potential risk of harm there. Now, is your position just... The district court has this obligation under Turner to evaluate any reasonable alternatives. Would you agree? I mean, I hear you taking the position you felt that plaintiffs did not raise the idea of these other ways to accomplish the phone calls. The district court had an independent obligation to do this Turner analysis. That's correct, but I believe based on the evidence presented and the testimony and the evidence presented to analyze whether or not based on that there were any reasonable alternatives. But the district court's whole plan for how written communication should take place, he creates a whole regime for that. The district court created that all on its own. Am I correct in my reading of the record? Correct. Well, the district court found that there was the concerns for phone communication were not necessarily present. In other words, I guess what I'm asking... But it's actually very specific. I think that's what... Yeah, the plaintiffs did not put forth this menu and a whole proposed policy plan for the district court on these written communications. The district court on its own created this very detailed new regime for written communications. I believe that's correct. Okay. I believe that's correct. The difference, though, I thought was that the district court found that there is this very de minimis burden. I mean, I could review a letter in one minute where if it was read to me, it might take eight minutes. I mean, the burden of saying I'm going to send a birthday card to my child, here's the birthday card, would take a parole officer 15 seconds to look at where monitoring a phone call and setting up a phone call and then listening to the phone call... Correct. There's a much bigger burden there. I think is what the district court found. Correct. That's correct. As well as the fact that the issue of the immediacy is not there. There's a bit of a lag time between the written communication being sent... Well, that's true. But Diane, our Judge Wood makes a good point that you can schedule appointments. You can schedule appointments and you can even say if you're going to have this here, you have five minutes to keep the burden of review to something manageable. Just touch in. I love you, honey. Have a good week. You could also have the therapist monitor phone calls. Let me ask this. One comfort to the district court and to the state, I see, is that there's this appeals process. Is the appeals process reasonably available to parolees where there's testimony that parolees did not know that they could challenge a decision, that it was taking too long in some particular way, they did not know how to contact Ms. Brown-Foylees, that it's not written down for them how to do X, Y, and Z? What's your position on that? Your Honor, my response to that is that there is testimony that this is a written policy that is provided to parolees once they are released onto parole during their initial meeting with their parole agent. They are provided this written policy. To the extent there was testimony that certain parolees may not have received a written response or received the written policy, that may be the basis for an as-applied claim that an individual brought to state that they couldn't actually, the appellate process was not available to them. But plaintiffs here have brought a facial challenge to the policy, and so there was certainly testimony, and actually the department's policy at the time was introduced as an exhibit at trial, stating that this is a written policy that is provided to parolees. So again, to the extent that there may be one-off situations where individuals aren't receiving the information or haven't received a written response, that may be a separate question for an as-applied challenge, but this is a facial challenge. I'm talking really on a granular level because the detail came out so many times that parolees could just contact Ms. Brown-Foyles if they were having a problem. So your position is they were told in writing they could contact her, and this is how. This is her phone number. This is her email address. Excuse me, Your Honor. I don't believe that is correct. In the written policy, I do not believe it provides her contact information or directs them to her, but it does state that once you receive a written response regarding your request for contact from the containment team, that an appeals process is available and that a form will be provided to you, to the parolee, in order for them to fill out to complete the parole process. So it's a broad statement is what we have in the record. An appeals process is available to you, full stop. There was testimony about that in the record, but the department's written policy was also entered into the record as evidence. What I'm asking is, is that the extent of what they are provided? Oh, as far as—if I understand Your Honor's question correctly, when they're having their initial meeting with their parole agent, if that's the extent of the information that's provided to them, it's just the written policy? The content of it, in terms of the appeal. What level of detail is provided to them about how to appeal? Your Honor, I believe that the written policy itself states that once the individual— once they receive a written response from the containment team, if the parolee wants to appeal that decision, that they will be provided with another appeal form in which they can fill out the information and then submit the appeal form to their parole agent. Speaking as to the plaintiff's procedural due process claim, although this court in the Feltsi case determined that the process there did not pass constitutional muster, there are significant factual differences between that case and this here and the district court properly concluded that the procedure here satisfies constitutional requirements. One of the several factors that this court considered in Feltsi that it determined meant that it did not pass constitutional muster was the fact that as a part of the appeals process, one of the factors it noted that there was no provision for review by persons not currently involved in the individual's diagnosis or treatment. That's certainly not the case here. Again, the appeals process allows an individual who is not involved in any treatment or supervision to review the containment team's decision. I would also just quickly like to respond to plaintiff's counsel's point regarding the necessity for someone outside of the Department of Corrections to review this decision, to review the containment team's decision. And Feltsi, as well as Washington v. Harper, make clear that a neutral decision maker does not necessarily need to be outside of the institution. Do you think that will survive the current Supreme Court's decisions about SEC administrative law judges? I suppose there's a chance that perhaps not. However, this court, again in Feltsi, specifically noted that a decision maker need not be external to an institution in order to be independent. So there's certainly— At least for the time being, you're making this argument. Okay. Another point I just want to address, plaintiff's counsel mentioned a reason why a therapist should not be the individual making this determination. Again, as the district court found and as this court noted, in fact the containment team collectively is making the decision, the therapist as well as input from the parole agent and the parole commander. Even though they never disagree with the therapist? I mean, the evidence is pretty clear. Let's just say there's tremendous deference to the therapist. Well, but certainly the department's deputy chief of parole testified that there is no policy that anyone automatically defers to a therapist, and each case is decided on a case-by-case basis. For all these reasons, we ask that you affirm the portions of the district court decision finding the department's policy to be constitutional. Thank you. Thank you. Ms. Nicholas. Thank you. I'd like to just speak briefly to the appeals process and its adequacy. Two points. First is the forms that the department created have to be considered as part of this policy, and the forms allow the therapist or the parole agent to simply check a box that says insufficient therapy sessions to make assessment and give that to the parolee as the sole basis for denying them contact with their child. As you saw in the record with Mr. Velna, he received that form ten times in a row, and he tried to appeal twice, but he had no idea why his therapist was refusing to make a recommendation. So really the ability to appeal has been frustrated by the department's policy. And just to be clear, he was having regular visits with this therapist? Every week. Yep. And the only way the appeal process is relevant, though, is if we find that the district court was wrong, that the therapist is not a sufficiently neutral and impartial decision maker, right? I mean, certainly the involvement of a neutral person at every level is important, but the therapist and the parole agent just simply aren't neutral in any meaningful way. Simply because the therapist is treating the individual. Exactly. That makes the therapist not neutral. I mean, I think therapists would disagree with you, by the way. You start from that premise to get to the appeal, and I think therapists would vehemently disagree with you, and they would say, no, we are neutral. Well, I'm curious your reaction to that, given the testimony of the therapist about the distinct roles between therapy and evaluation. That's exactly right. Dr. Blain himself testified that it was a potential conflict of interest to be both the treating therapist and the evaluator of risk. And the SOMB standards to which the department cited are consistent with that, which is that an appropriate evaluator is somebody who is coming in neutral, doing the risk assessments, doing the actuarial tests, and making a decision from there. And then just one final point about what happened in the Fels case, which is that there were three levels of grievances. You could grieve to people who weren't the initial decision makers. You could grieve to people who weren't your treater. But this court still found that that process was insufficiently neutral to make a decision affecting somebody's constitutional rights, as we have here. So we're asking the court to reverse the district court's decision. Thank you. Thank you, Ms. Douglas. And the case will be taken under advisement.